UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

JUN 29 2011

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

JENNIFER M. McGOWAN,

      Plaintiff,

v.

                                      Civil Action No. 2:10cv388

ABM JANITORIAL SERVICES,
NORTHEAST, INC.,

and

URSULA BASKETT,

      Defendants.

## OPINION AND ORDER

This matter is currently before the Court on a 12(b)(1) motion to dismiss filed by defendants ABM Janitorial Services, Northeast, Inc. and Ursula Baskett, an employee of ABM Janitorial Services, Northeast, Inc. (collectively "ABM"). Defendants' motion alleges that this court lacks jurisdiction over the complaint filed by plaintiff Jennifer McGowan because the claims set forth therein are preempted by Virginia's Workers' Compensation laws. The motion has been fully briefed and is ripe for decision. After examination of the briefs and the record, the Court has determined that a hearing on the instant motion is unnecessary, as the facts and legal arguments are adequately presented, and the decisional process would not be aided significantly by oral argument. For the reasons stated herein, the Court **GRANTS** defendants' motion.

## I. Facts and Procedural History

### A. Facts

For the purposes of resolving the jurisdictional issue before the court, the facts are undisputed.

Plaintiff Jennifer McGowan began her employment with Bank of America in 1997, and she remains a Bank of America employee today. At the time of the accident that prompted the instant suit, Ms. McGowan was a "Level 3 Sales Associate" working at 2 Commercial Place in Norfolk, Virginia. Her job responsibilities included conducting educational programs and on-the-job training for new employees in customer marketing. Such training occurred in Bank of America's office areas on the first and fourth floors of 2 Commercial Place.

On September 18, 2008, Ms. McGowan finished teaching a class at approximately 6:00 or 6:30 p.m. After class, she went to Bank of America's first floor work area to pull reports and statistics for the sales associates undergoing training. Ms. McGowan finished this task and was in the process of leaving the first floor office area when her accident occurred.

Bank of America's first floor work area at 2 Commercial Place is accessed through a set of double doors. Just outside the double doors is a lobby area that has a security desk and four elevators, two on each side. At the time of the accident there were two trash cans in such lobby area, one between each set of elevators.

2

At approximately 7:00 or 7:30 p.m. on September 18, 2008, Ms. McGowan exited the work area double doors and approached the elevator bank to her right, intending to take the elevator down to the parking garage. As Ms. McGowan approached the elevators, a woman on the opposite side of the hallway (purportedly an ABM employee) told Ms. McGowan to have a good night. According to Ms. McGowan, after she pressed the elevator button the next thing she knew she was on the floor. Because Ms. McGowan was facing the other bank of elevators in response to the woman's pleasantry, Ms. McGowan hit her head against the wall behind her as she fell. Security guards and the ABM employee immediately came over to help Ms. McGowan. While still on the floor, Ms. McGowan felt something greasy on the floor next to the trash can. As a result of her fall and the injuries she suffered, Ms. McGowan filed a workers' compensation claim and received workers' compensation benefits.

Bank of America leases 2 Commercial Place, and the written lease requires Bank of America to maintain 2 Commercial Place in "good order, repair and condition, ordinary wear and tear excepted." A Bank of America corporate representative deposed as part of this case testified that Bank of America considers it important to keep its facilities "clean," "safe," and "attractive," for associates and/or customers, depending on the location.

In order to achieve such goals, Bank of America and ABM entered into a contract that requires ABM to provide janitorial

services at 2 Commercial Place. Two Commercial Place is a nine-story commercial building that is occupied almost entirely by Bank of America. On the first floor of the building there is commercial office space occupied by Bank of America, a cafeteria open to the public, a beauty shop, and a small market. The upper floors contain commercial office space including individual offices, meeting/conference rooms, and large open office areas divided into work cubicles. There are also support areas including kitchens and break rooms on each floor, supply rooms, and other administrative areas, including some reception areas and computer rooms. Each floor has restrooms, and there is a one story parking garage inside the building. There is not a Bank of America bank branch in 2 Commercial Place.

ABM has a small office space, a storage area, and janitor closets at 2 Commercial Place. The office, located on the first floor, is used for supplies and for administrative support for the on-site supervisor. A storage room in the garage is used to store and mix chemical cleaning supplies. ABM has locked janitors' closets on each floor that are used for storing vacuums. ABM is responsible for the cost of the cleaning supplies it uses at 2 Commercial Place, but it charges consumable items back to Bank of America. Consumable items include: towels, toilet paper, tissues, trash bags, seat covers, sanitary napkins, and hand soap.

At the time of Ms. McGowan's accident, ABM's cleaning routine

4

was divided into day operations and night operations. The day operations were provided from 8 a.m. to 5 p.m., and night operations were provided from 6 p.m. to 10 p.m. During the day, ABM provided a day supervisor and two day porters. The day supervisor was responsible for checking all floors and responding to any work orders that came in. The two day porters were responsible for restocking the restrooms, removing trash in all break rooms, vacuuming the elevators twice a day, sweeping the stairs weekly, cleaning the entrance door glass, helping with any work orders that were called-in, and mopping and vacuuming the cafeteria entryway and dining room. In the evenings, ABM provided a night supervisor and employees to complete the necessary janitorial functions. The night shift functions included vacuuming, dusting, collecting trash, cleaning the kitchens on each floor, detailing restrooms, and restocking supplies. Additionally, an ABM "utility employee" mopped the kitchen floors, cleaned elevator tracks, and removed the trash from each floor that had been collected by other ABM employees. Once a week, ABM employees buffed floors and scrubbed all restroom floors. One a month, ABM employees scrubbed and recoated kitchen and break-room floors. Once a year, ABM employees stripped and waxed floors and shampooed carpets.

Notwithstanding the detailed cleaning routine, ABM did not perform all the cleaning in the building. At the time of the

accident, companies other than ABM handled cleaning the interior and exterior windows and took care of the live plants in the building. Additionally, if construction was performed in the building, someone else was responsible for cleaning the construction areas. Although ABM cleaned the common areas of the public cafeteria, it did not clean behind the food line or the work areas of the cafeteria. ABM also did not provide any janitorial services to the market or the beauty shop on the first floor of 2 Commercial Place.

Bank of America's direct employees performed no janitorial services at 2 Commercial Place. Each employee was, of course, responsible for keeping his or her own work area clean, which may involve placing things in a trash can or in a special confidential trash bin. Additionally, employees would often clean up after themselves in the common break-rooms.

## B. Procedural History

The instant suit was initially filed in the Circuit Court for the City of Norfolk, Virginia. It was removed to the United States District Court for the Eastern District of Virginia and assigned to the undersigned judge. Defendants thereafter filed a motion to dismiss for lack of jurisdiction. Plaintiff filed a memorandum in opposition and defendants filed a reply brief. Accordingly, this matter is ripe for review.

6

## II. **Standard of Review**

"The district courts of the United States are courts of limited subject matter jurisdiction." United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009). Because district courts only possess the jurisdiction authorized by the Constitution and federal statute, "when a district court lacks subject matter jurisdiction over an action, the action must be dismissed." Id.

When the existence of subject matter jurisdiction "in fact" is challenged by a defendant, the burden of establishing the jurisdictional facts by a preponderance of the evidence falls on the plaintiff. Id.; Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). In resolving a 12(b)(1) motion, as long as the jurisdictional facts and the facts central to the merits of the case are not intertwined, a district court may "go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." Vuyyuru, 555 F.3d at 348. A district court may consider such evidence "without converting the proceeding to one for summary judgment." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999) (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)). A 12(b)(1) motion to dismiss should be granted if the jurisdictional facts reveal that "the moving party is entitled to prevail as a

matter of law." <u>Id.</u> (quoting <u>Richmond, Fredericksburg & Potomac</u> <u>R.R. Co.</u>, 945 F.2d at 768).[1]

## III. Discussion

The Virginia Workers' Compensation Act provides exclusive rights and remedies to employees that have been injured during the course of their employment. Va. Code Ann. § 65.2-307(A). "The fundamental purpose of the Virginia Workers' Compensation Act is to give compensation for <u>accidental</u> injuries arising out of and in the course of employment without regard to fault." <u>Stone v. Allstate</u>

---

[1] The parties agree that the issue before the court is jurisdictional, and is therefore properly considered pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Because the Fourth Circuit has affirmed a 12(b)(1) dismissal for lack of subject matter jurisdiction in a similar Virginia Workers Compensation Act case, this court conducts a Rule 12(b)(1) analysis. <u>See</u> <u>Evans</u>, 166 F.3d at 647-50. However, this court acknowledges that, subsequent to <u>Evans</u>, some district courts have raised questions regarding the propriety of classifying the instant dispute as "jurisdictional." <u>See</u> <u>Harvard v. Perdue</u> <u>Farms, Inc.</u>, 403 F. Supp. 2d 462, 464-65 (D. Md. 2005) (indicating that although the Virginia courts treat this issue as jurisdictional, federal jurisdictional rules do not "import such Virginia procedural law into its jurisprudence"); <u>Graves v. Cook</u>, No. 7:01cv533, 2002 U.S. Dist. LEXIS 6794, at *1 n.1 (W.D. Va. Apr. 17, 2002) (unpublished) (converting a 12(b)(1) motion to dismiss into a motion for summary judgment because the district court had diversity jurisdiction over the case, and "[i]f the court were to consider the Virginia Workers' Compensation Bar as a jurisdictional question, then the Virginia General Assembly would effectively determine the limits of federal jurisdiction"). This court need not reach the question of whether conversion into summary judgment is required because the material facts before the court are undisputed, and all parties have had ample opportunity to conduct discovery and submit any materials pertinent to the issue before the court. Were this court to treat the pending motion as a Rule 56 motion for summary judgment, the result would be same – judgment for defendants and termination of this action.

8

Ins. Co., No. 1700-10-3, 2011 Va. App. LEXIS 150, at *9 (Va. App. May 3, 2011) (unpublished) (citing Lawrence J. Pascal, Virginia Workers' Compensation: Law and Practice 1-3 (3d ed. 2000)). While an employee injured in the course of her employment surrenders the right to bring a common law damage suit against her employer, in exchange she receives all the benefits of the Workers' Compensation Act without the burden of establishing her employer's negligence. See Feitig v. Chalkley, 185 Va. 96, 98, 38 S.E.2d 73, 73-74 (1946) (describing the Virginia Workers' Compensation Act as follows: "The employee surrenders his right to a trial by jury and agrees to accept an arbitrary amount fixed by statute in lieu of full compensation for the injuries sustained. He gains a wider security. The issue of negligence or non-negligence of the employer and the fellow servants is eliminated. Long, costly and delayed litigation is avoided. A smaller but speedier recovery is guaranteed."). In essence, under the Workers' Compensation Act, the employer has agreed to unconditional liability in exchange for limiting the amount of liability.

The limitations of remedies imposed on an injured employee by the Virginia Workers' Compensation Act are not applicable only to suits against the employee's immediate employer. Therefore, the fact that a plaintiff is not directly employed by an alleged tortfeasor does not automatically mean that such plaintiff can maintain a tort suit against such party. In addition to the bar to

9

recovery against a plaintiff's actual employer, the Virginia Workers' Compensation Act prohibits an employee from bringing a tort action against a party who is deemed to be the employee's "statutory employer." As explained by the Virginia Supreme Court:

> Under certain circumstances, Code § 65.2-302 extends . . . immunity from tort liability arising from workplace accidents to qualifying employers, even though no direct common law contract of employment exists between such employers and employees. An employer qualifies for this immunity if the employer, acting as a general contractor, contracts with another to perform all or part of the employer's trade, business or occupation. Under these circumstances, the employer is deemed the statutory employer of the employees of such other subcontractor and the remedies under the Act are the statutory employees' exclusive remedy against the statutory employer. See id.; Evans v. Hook, 239 Va. 127, 131, 387 S.E.2d 777, 779 (1990); Smith v. Horn, 232 Va. 302, 306, 351 S.E.2d 14, 16 (1986). Similarly, employees of different subcontractors who are working on the same project and are also engaged in the general contractor's trade, business, or occupation are considered statutory fellow employees and are entitled to protection from an independent tort action for injuries allegedly caused by either of them.

Hudson v. Jarrett, 269 Va. 24, 29-30, 606 S.E.2d 827, 829 (2005).

An exception to the exclusivity provisions of the Virginia Workers' Compensation Act permits a plaintiff to recover against a non-employer "other party" that is responsible for plaintiff's injuries. Va. Code Ann. § 65.2-309(A). The Supreme Court of Virginia has adopted three tests, applicable in different fact patterns, to determine if a defendant qualifies as an "other party," thereby subjecting such defendant to potential liability for plaintiff's injuries. See Stone v. Door-Man Mfg. Co., 260 Va.

10

406, 415-18, 537 S.E.2d 305, 309-311 (2000) (discussing the three tests: the "normal work" test; the "subcontracted fraction" test; and the "stranger to the work" test). Of these three tests, the "stranger to the work" test is applicable when, as here, an employee of a business brings a personal injury action against a subcontractor hired by the owner of the business. Id. at 418-19.

The "stranger to the work" test is derived from the language of the Virginia Code, and asks whether the subcontractor defendant is "a stranger to the trade, occupation, or business in which the plaintiff was involved." Id. at 418 (quoting Whalen v. Dean Steel Erection Co., 229 Va. 164, 167, 327 S.E.2d 102, 104 (1985)). As explained in more detail by the Virginia Supreme Court:

> The test is not whether the owner, by engaging an independent contractor to perform some part of his business, thereby engages in the business of the independent contractor. It is whether the independent contractor is performing work that is part of the trade, business or occupation of the owner. If he is, and in doing the work injures an employee of the owner, then the independent contractor, in the same fashion as any other employee of the owner, is not a third party against whom the injured employee's right of action is preserved; but the employee so injured is limited to the compensation provided by the Workmen's Compensation law . . . .

Fowler v. Int'l Cleaning Service, Inc., 260 Va. 421, 427, 537 S.E.2d 312, 315 (2000) (quoting Floyd v. Mitchell, 203 Va. 269, 274, 123 S.E.2d 369, 372 (1962)).

Here, plaintiff McGowan acknowledges that she is clearly barred from recovering from Bank of America, her employer, based on the exclusivity provision of the Virginia Workers' Compensation

11

Act. The question before the court is whether Ms. McGowan can recover from ABM, a janitorial subcontractor hired by Bank of America. To answer this question, the court is guided by Virginia case law applying the "stranger to the work" test. Although such cases provide compelling guidance, "[w]hether a third party is engaged in the trade, occupation, or business of the employer 'depends upon the facts and circumstances in each case, and for that reason the question does not readily yield to categorical or absolute standards.'" Conlin v. Turner's Express, Inc., 229 Va. 557, 559, 331 S.E.2d 453, 455 (1985) (quoting Bassett Furniture v. McReynolds, 216 Va. 897, 902, 224 S.E.2d 323, 326 (1976)); see Whalen, 229 Va. at 168, 327 S.E.2d at 105 ("The 'stranger to the work' test, applied to varying facts, necessarily produces varying results.").

The parties agree that the most factually analogous Virginia Supreme Court case to the instant facts is Fowler v. Int'l Cleaning Service. The plaintiff in Fowler was an employee of a Sears furniture store who slipped on a tile-floor in the store after it was "wet-mopped" by an employee of International Cleaning Service ("International"). Fowler, 260 Va. at 423-24, 537 S.E.2d at 313. At the time of the accident, International had been under contract to provide cleaning and janitorial services at Sears' furniture store for approximately three years, the entire period that the store was open. Id. at 424, 537 S.E.2d at 313. International's

12

services were defined by Sears' guidelines, and International "regularly cleaned the store on Mondays and Fridays of each week, spending two to three hours per day at the store during the same hours Sears' employees were on the job." Id., 537 S.E.2d at 313. International furnished its own cleaning supplies that it kept in unlocked janitor's closets. Id., 537 S.E.2d at 313. Sears provided paper towels, hand soap and toilet paper for the store, and although Sears' employees did not clean the bathrooms or mop floors, they did clean up after themselves, sweep the warehouse, carry trash to the dumpsters, and occasionally borrowed a vacuum from International's janitor's closets. Id., 537 S.E.2d at 313. Unsurprisingly, Sears considered it important to keep not only its showroom, but its work area and other parts of the store "clean, attractive, and safe." Id. at 425, 537 S.E.2d at 313. To accomplish such goal, it was "part of every employee's job description to participate in making a good appearance to the public." Id., 537 S.E.2d at 313.

In applying the above facts to the applicable test, the Supreme Court of Virginia concluded that International was not a "'stranger' to Sears' 'particular business' of selling furniture." Id. at 428, 537 S.E.2d at 315. The Court noted that in making such determination, "a key consideration [was] whether, in providing cleaning and janitorial services to Sears, International was 'performing an essential part' of Sears' furniture business."

Id., 537 S.E.2d at 315 (quoting Whalen, 229 Va. at 169, 327 S.E.2d at 105). The Court found that the facts sufficiently demonstrated that "[t]he combined efforts of International and Sears were designed to accomplish Sears' goal of making its store clean, attractive and safe – a goal necessary to the successful operation of Sears' furniture business." Id., 537 S.E.2d at 316.

Here, ABM highlights the factual similarities to Fowler, including: (1) a janitorial subcontractor responsible for cleaning the floors is allegedly at fault for the plaintiff employee's fall in the workplace; (2) a business owner dictating to the subcontractor the location and extent of the required cleaning; (3) the owner paying for consumable items including towels, tissues, and hand soap; and (4) the business owner considers it important to keep the premises clean, safe, and attractive. Further similarities include the fact that the public utilized portions of the premises cleaned by the subcontractor and that the subcontractor was provided space on the premises to store its tools and supplies. Additionally, ABM argues that the fact that Bank of America was required by its lease to keep the building clean further demonstrates that the janitorial function is essential to Bank of America's business at 2 Commercial Place.

In contrast to the above, plaintiff McGowan highlights several differences between the facts of Fowler and the instant facts, including: (1) the retail furniture store in Fowler operated to

14

generate sales to the public, whereas Bank of America's operations at 2 Commercial Place do not include a bank branch, and are instead primarily private company offices; (2) Sears' employees in _Fowler_ actively participated in cleaning the store, whereas here, ABM performs the janitorial functions without assistance from Bank of America employees; (3) in _Fowler_, Sears had access to the janitors' closets and directly provided consumable items and janitorial warning signs, whereas here, ABM keeps its janitorial closets locked and ABM provides the consumable items that are later billed back to Bank of America; and (4) in _Fowler_, every employee was responsible to participate in "making a good appearance to the public," whereas here, Bank of America employees do not have such responsibility as the general public does not come to 2 Commercial Place to transact business with Bank of America. Additionally, Ms. McGowan argues that Bank of America's contractual requirement to keep 2 Commercial Place clean does not make ABM "necessary" to Bank of America's business, if it did, plumbing, electricity, heating and air, and other similar services would always be deemed part of a company's trade, business, or occupation, because these services are generally viewed as "essential" to a business's operation.

After considering the above arguments, the court finds that the case-specific facts before the court establish that ABM is not a "stranger" to Bank of America's business at 2 Commercial place. First, although in contrast with the facts of _Fowler_, this court

15

puts minimal weight on the fact that the premises at issue is not kept clean by "joint efforts" of Bank of America employees and subcontractors. Although the Fowler opinion appears to rely heavily on the "joint efforts" in that case, this court does not construe such reliance as creating a prerequisite of "joint efforts." Rather, this court construes the Fowler court's focus on "joint efforts" as a means to demonstrate the importance of keeping Sears' premises clean, safe, and attractive. Stated differently, keeping the Sears store in such condition was so important to the business owner that employees took steps to clean the store each day, and an outside cleaning company came in twice a week to perform additional cleaning. Although such "joint efforts" demonstrate the importance of such tasks to the business in that case, in other fact patterns, an equally important task may be subcontracted entirely to a third-party.[2] Accordingly, here, the lack of joint efforts does not reduce the importance of ABM's work.

---

[2] The court can hypothesize scenarios where rather than minimizing the importance of a task, relying entirely on subcontractors to perform an essential business function actually underscores the importance of such function. Thus, just as "joint efforts" can demonstrate that an undertaking is essential to a business, leaving an essential function entirely to a subcontractor with expertise in such area can likewise demonstrate that such function is mission critical. By way of example, having on-site, around the clock armed security may be absolutely essential to a certain type of business, yet rather than relying on its own employees to "jointly" participate in such task, the business may subcontract such specialized function entirely to a third-party with established experience in such field. On such facts, the lack of "joint efforts" in no way minimizes the necessity of the security function to the successful daily operation of the business.

16

Second, although keeping Sears' retail store "attractive" for the benefit of prospective furniture buyers may be of greater importance than keeping 2 Commercial Place attractive, Bank of America is nevertheless motivated to keep its premises attractive and safe for its numerous employees, the public, and any invitees. The undisputed facts establish that almost all of the nine floors at 2 Commercial Place are occupied by Bank of America, and the size of the large scale commercial operation at such location plainly supports Bank of America's claim that it was important to keep its facilities "clean," "safe," and "attractive," not only for the public, but for its many associates. It is difficult to conceive how such a nine-story commercial building, with both private and public spaces, including a lobby and cafeteria, could effectively operate without someone providing daily janitorial functions.

Third, Bank of America, as opposed to the building owner, is required by contract to keep 2 Commercial Place in "good order, repair and condition." As in Fowler, here, the business owner is responsible for covering the cost of the janitorial subcontractor. Additionally, the business owners in Fowler and the instant matter both paid for the cost of consumable items including towels, tissues, and hand soap. Even without a bank branch at 2 Commercial Place, between the public cafeteria on the first floor, and the numerous employees working above, Bank of America has a strong incentive, contractual and otherwise, to keep the premises clean.

Fourth, the court finds that the extent of the janitorial work performed by ABM, which was required by the Bank of America/ABM contract, to be a compelling factor supporting the finding that ABM was not a "stranger" to Bank of America's business. Notably, Bank of America provided ABM with a detailed list of areas to clean, both during and after regular business hours. This detailed daily cleaning required the presence of multiple ABM employees, split into a day-shift and night-shift, whereby ABM was actively cleaning the building for 13 hours each regular workday.[3] ABM's responsibilities included cleaning and stocking bathrooms, keeping the stairs and elevators clean, cleaning the kitchens/break-rooms, vacuuming and dusting the upper floors of the building, cleaning the entry door glass, collecting and removing trash from each floor, and cleaning the area of the cafeteria open to the public. Notable to the court is not only the sheer size of the area cleaned, and the fact that some areas were open to the public, but the fact that Bank of America determined that extensive cleaning was necessary each and every day. Furthermore, like the long-term business relationship in Fowler, here, ABM's contract with Bank of America was for a three year term. Far from being a "stranger" to Bank of America's business at 2 Commercial Place, on most business days, one or more ABM employees were engaged in some form of

_____

[3] In contrast, the janitorial subcontractors in Fowler were typically on Sears' premises only twice a week for two to three hours each day.

18

cleaning from 8 a.m. until 10 p.m., likely a longer period than most full-time Bank of America employees were in the building. Accordingly, ABM's ongoing daily work functions suggest "business as usual" at 2 Commercial Place. Stoddart v. Floor Care Specialists, Inc., 56 Va. Cir. 309, 311 (Danville 2001).

A review of Virginia cases decided subsequent to Fowler further supports the above analysis. In Anderson v. Dillow, the Supreme Court of Virginia affirmed the Circuit Court's finding that subcontractor Waste Management was not a "stranger" to the business of Virginia Internataional Terminals ("VIT"), a corporation contractually responsible for managing, operating, and conducting the business of Norfolk International Terminal ("NIT"). Anderson v. Dillow, 262 Va. 797, 799, 553 S.E.2d 526, 527 (2001). NIT is a "commercial port whose operations include loading and unloading commercial freight, storing commercial freight in warehouses, breaking down freight from shipping containers, removing shipping material from freight, and general maintenance of port facilities." Id. at 800, 553 S.E.2d at 527. According to an affiant in the case, removal of shipping debris and waste from the port "was an essential part of VIT's business of operating the port and maintaining NIT in a clean, safe and orderly manner . . . ." Id., 553 S.E.2d at 527.

The plaintiff in Anderson, a VIT employee, was injured by subcontractor Waste Management while such subcontractor was in the

19

process of emptying large trash containers located at the port. "Monday through Friday of each week" a Waste Management truck emptied such trash containers, thereby "remov[ing] shipping debris and waste from the terminal premises." Id. at 800-01, 553 S.E.2d at 528. Applying the "stranger to the work" test, the trial court determined that in order to "reasonably operate the terminal in a clean, safe, and orderly manner, the premises had to be kept free of large quantities of shipping debris and waste generated daily." Id. at 801, 553 S.E.2d at 528. The Virginia Supreme Court agreed with such conclusion, noting that VIT could have elected to buy its own equipment to remove waste from the port, but it instead elected to subcontract such function to Waste Management. Id. at 802, 553 S.E.2d at 528. The fact that VIT was the party required to pay Waste Management's Fees "emphasize[d] VIT's 'overarching responsibility' for maintaining and operating NIT." Id., 553 S.E.2d at 529. The Court therefore concluded that, even though Waste Management merely emptied dumpsters that VIT filled, Waste Management's role "cannot be deemed merely incidental to the operation and maintenance of th[e] terminal facility . . . ." Id., 553 S.E.2d at 529. Notably, the fact that the port facility was "commercial" and apparently not held open to the public did not prevent the Court from concluding that keeping such facility clean, safe, and orderly was essential to the business.

Similarly, here, Bank of America was contractually obligated

to maintain 2 Commercial Place in a clean and orderly fashion. Like Anderson, here, the essential nature of the subcontractor's function is demonstrated by the fact that the subcontractor's work was required to be performed each and every regular business day. Furthermore, the fact that Bank of America, like VIT, was responsible for paying the subcontractors associated with cleaning/trash pickup, as opposed to such fees being paid by the premises owner, emphasizes such parties' "overarching responsibility" for properly maintaining the premises.

In addition to the above similarities, the court notes that ABM performed a more involved, time consuming, and complete function than VIT's subcontractor. Waste Management merely emptied the trash dumpsters after VIT "collect[ed] the debris and waste generated by the operations and maintenance function throughout the terminal." Id., 553 S.E.2d at 528. Waste Management's function was therefore only "the final part of VIT's own responsibility to maintain the premises free of debris and waste." Id., 553 S.E.2d at 528 (emphasis added). In contrast, ABM collected and removed trash from each waste basket on each floor of the nine story commercial building. Furthermore, ABM cleaned and vacuumed and otherwise kept the entire premises free of debris. ABM's completion of such tasks appear to have taken far more time than Waste Management's function, a factor that further reveals that ABM's work was essential to Bank of America's daily operations.

Additionally, unlike the port, which does not appear to have been open to the public, at least a portion of 2 Commercial Place is open to the public, and ABM's job responsibilities directly served/protected the safety of the public.

Another factually similar post-Fowler case that likewise supports this court's conclusion involves a janitorial services company hired to clean a urology clinic ("Clinic"). Stoddart, 56 Va. Cir. at 309. In Stoddart, the plaintiff, a Clinic employee, was injured when she slipped on a wet substance on a Clinic restroom floor. The Clinic's primary mission was to provide medical services to patients, and although the plaintiff was a transcriptionist that worked in an area away from the areas frequented by patients, a Clinic representative testified that it was important that the medical facility be kept clean. Id. at 311. The subcontracted janitorial company hired by the Clinic was essentially responsible for all cleaning services, and the subcontractor's equipment, including vacuums and mops, was stored in janitorial storage areas on the Clinic's premises. Id. at 310. The janitorial services were provided by the subcontractor on a daily basis. Id. at 311.

The plaintiff in Stoddart argued that several facts differentiated the case from Fowler, including both the fact that the Clinic provided professional services, as opposed to retail goods, and the fact that Clinic employees did not "jointly"

participate in cleaning. However, the circuit court nevertheless held that the janitorial employees were not "strangers" to the Clinic's business. In reaching such conclusion, the court explained:

> Although Clinic provides specialized professional services, [the Clinic representative] testified that if an independent contractor did not provide janitorial services, Clinic would have to hire staff to perform such services. It comes as no surprise that individuals seeking medical attention would expect clean and orderly examination and treatment facilities. [Subcontractor] Floor Care provides janitorial services each regular business day and more extensive services on a periodic basis. Floor Care is certainly not a stranger to Clinic. To the contrary, daily janitorial service is the norm and constitutes business as usual for Clinic. Clinic actually purchases supplies used by Floor Care and has access to Floor Care's equipment. Clinic's employees were expected to clean up certain spills and messes under certain conditions. The fact that most of Clinic's basic janitorial needs are provided by independent contractors does not in and of itself mean that services provided by Floor Care are unnecessary or that there is insufficient "joint" activity to avoid application of the Act's exclusivity bar.
>
> . . . . If janitorial services were unnecessary to the ongoing operation of a medical practice, it seems unlikely that Clinic would pay the considerable fees and costs required by its contract with Floor Care. . . .

Id. at 311-12 (emphasis added).

Similarly, here, Bank of America essentially delegated the entire cleaning function to ABM, its janitorial subcontractor. ABM kept cleaning supplies and tools on Bank of America's premises and even had a small office there. Although Bank of America did not have a bank branch on the premises, it was still important to keep the premises clean and safe for associates and the public.

Furthermore, in both Stoddart and the instant matter the essential nature of the subcontractor's function is demonstrated by: (1) the subcontractor's performance of substantial functions for what presumably constituted "considerable fees,"; and (2) the subcontractor's daily presence on the employer's premises. In both cases, the subcontractor "provide[d] janitorial services each regular business day and more extensive services on a periodic basis." Id. Accordingly, "[ABM] is certainly not a stranger to [Bank of America]. To the contrary, daily janitorial service is the norm and constitutes business as usual for [Bank of America]." Id. at 311.

Based on the forgoing, the court finds that ABM is not a "stranger" to Bank of America's business. As a result of such finding, the Virginia Worker's Compensation Act statutory bar prevents plaintiff from recovering from ABM. Defendants' 12(b)(1) motion to dismiss is therefore granted.

## IV. Conclusion

For the reasons set forth in detail above, the court finds that the Virginia Workers' Compensation Act statutory bar precludes plaintiff from recovering from defendant ABM. Accordingly, the motion to dismiss is **GRANTED**.[4]

_____

[4] Alternatively, because the facts are undisputed and the parties have had ample opportunity to submit relevant materials (they agreed to the submission of evidence without the need for an evidentiary hearing), if necessary to construe the instant motion as a motion for summary judgment, the court grants summary

24

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED**.

/s/ Mark S. Davis

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
June 29 , 2011

---

judgment in favor of defendants.